**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-cv-22612-ALTMAN**

**MIGUEL QUINTERO**,

     *Plaintiff,*

*v.*

**MIAMI-DADE COUNTY**, *et al.*,

     *Defendants.*

_____/

## <u>ORDER ON MOTION TO DISMISS</u>

Our Plaintiff, Miguel Quintero, alleges that the Defendants, Miami-Dade County and several county officials (the "Individual Defendants"), have violated his constitutional rights. *See generally* Complaint [ECF No. 1]. The Defendants have now moved to dismiss the Complaint. *See generally* Motion to Dismiss ("MTD") [ECF No. 30].[1] After careful review, we **GRANT** the MTD.

### THE FACTS

Quintero is a "flying trapeze artist who loves the art." Complaint ¶ 11. In June 2020, Quintero purchased a home in Miami-Dade County and "built a trapeze set [on the property] to practice his skills." *Id.* ¶ 12. Shortly after construction of the trapeze set was complete, Quintero "began teaching other people how to use the trapeze." *Id.* ¶ 14. "In September of 2021, the County issued Mr. Quintero a 'courtesy warning' for running a business, *i.e.* Miami Flying Trapeze, from his home without obtaining a certificate of use." *Id.* ¶ 15. Over the next several months, Quintero spoke with several Miami-Dade County Regulatory and Economic Resources Division ("RER") employees about his trapeze set. *See id.* ¶ 16. "During these conversations, James Byers, the Chief of RER's Zoning

---

[1] The MTD is fully briefed and ripe for adjudication. *See* Response to MTD ("Response") [ECF No. 57]; Reply in Support of MTD ("Reply") [ECF No. 63].

Division, told Mr. Quintero that he could utilize his trapeze set for his personal use, but could not use it for his home-based business without a certificate of use." *Id.* ¶ 17. Quintero disagreed with Byers's findings and "asked for a consortium of high-ranking County officials to address the issue." *Id.* ¶ 19. In December 2021, Quintero was asked to "remove the advertising of Miami Flying Trapeze from the internet and cease operation until Mr. Byers had an opportunity to speak with senior management." *Id.* ¶ 21. In exchange for Quintero agreeing to remove his promotional materials from the internet, "the County agreed to close [the] case." *Id.* ¶ 22.

Almost a year later, on September 2, 2022, Quintero received a letter from the County, identifying several building and code violations on his property. *See id.* ¶ 24 ("The County claimed in the letter that: (i) Mr. Quintero's tree house had been built without the requisite permits; (ii) his plans for a Tiki Hut were improper; (iii) his utility shed needed a building permit; (iv) his vacation rental application was denied because of outstanding code violations; (v) his trapeze set required a building permit; (vi) his home had an illegal addition; and (vii) his solar roof permit expired."). "Quintero was stunned when he received the September 2, 2022, letter because many of the alleged violations listed therein were unfounded or inaccurate." *Id.* ¶ 25. Quintero believes that the County used drone surveillance to conduct the "electrical inspection" of his property that revealed the purported violations. *Id.* ¶ 27. Quintero tells us that he "learned that RER routinely uses drone surveillance on private property," though he doesn't tell us how he "learned" this information, claiming in a footnote only that he "reviewed several other RER cases online and noticed that the County had a widespread practice of using drone surveillance on private property." *Id.* ¶ 29 n.3. From September 8–12, 2022, Quintero protested the County's alleged drone surveillance program—along with the County's failure to provide him with complete records about his property and business. *See id.* ¶¶ 30–36.

On September 20, 2022, Quintero "attempted to inform the Mayor and County Commission about the County's aerial surveillance practice and RER's unjust treatment of him" at a County

Commission meeting. *Id.* ¶ 38. Three days later, Quintero received "four 'courtesy warnings' for alleged violations on his property." *Id.* ¶ 43. Quintero believes that these courtesy warnings were a retaliatory attempt to penalize him for "exercising his constitutionally protected First Amendment right to free speech" at the September 20, 2022 County Commission meeting. *Id.* ¶ 48.

On September 26, 2022, Quintero—equipped with a "body-worn camera"—drove to RER headquarters to "request additional public records from RER." *Id.* ¶¶ 51, 50. Quintero alleges that, after he arrived, County "officials claimed that he was violating a county ordinance that prohibited filming in government buildings," "directed their subordinates to refuse service" to Quintero, and "called the Miami-Dade Police Department to remove" him from the premises. *Id.* ¶¶ 52–54. The next day, Quintero received "another citation for the trailer on his property." *Id.* ¶ 60.

Quintero adds that he's been subject to at least two "warrantless search[es]," during which County code enforcement officers photographed his property. *See id.* ¶¶ 63–65 ("On February 28, 2023, Code Enforcement Officer Vincent Carr unlawfully entered Mr. Quintero's gated property where no trespassing signs are posted. Officer Carr searched Mr. Quintero's curtilage without a warrant and without Mr. Quintero's permission. Officer Carr then began photographing areas of Mr. Quintero's home where he had no right to be."); *see also id.* ¶¶ 69–70 ("On August 26, 2023, Code Enforcement Officer Nicole Lopez also disregarded the no trespassing signs on Mr. Quintero's property and conducted a warrantless search. Officer Lopez then illegally photographed Mr. Quintero's property, which the County published on its website.").

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the

3

reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ibid.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

### ANALYSIS

Quintero's Complaint asserts twenty counts—all arising from the Defendants' alleged constitutional and state-law violations. *See* Complaint ¶¶ 109–241. But many of these counts have been dismissed or abandoned.[2] We'll therefore address only his remaining claims. *First*, Counts I, III, and

---

[2] We dismissed Counts VI (Unlawful Search, Vincent Carr) and VII (Unlawful Filming, Vincent Carr) because Quintero failed to serve Defendant Vincent Carr. *See* Paperless Order Dated Oct. 25, 2024 [ECF No. 19] ("Defendant Vincent Carr is DISMISSED without prejudice." (emphasis removed)). And Quintero voluntarily dismissed Counts V (Failure to Train or Supervise, Miami-Dade County); X (First Amendment Retaliation, James Byers); XIV (First Amendment Interference, Miami-Dade County); XV (Failure to Train or Supervise, Miami-Dade County); XVI (Failure to Supervise, Suzanne Trutie); XX (Declaratory Relief, Miami-Dade County); and XXI (Injunctive Relief, Miami-Dade County) in his Response. *See* Response at 7 n.3 ("All of these Counts have to do with a citizen's right to record in public, which is a fight for another day."). The Complaint is mislabeled and doesn't actually include a Count XI.
    Quintero has also abandoned several claims by failing to respond to the Defendants' arguments about them. *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed." (cleaned up)). For instance, the Defendants ask us to dismiss Counts II (Unlawful Filming, Miami-Dade County) and IX (Unlawful Filming, Nicole Lopez) as duplicative of Counts I (Unlawful Search, Miami-Dade County) and VIII (Unlawful Search, Nicole Lopez), respectively. *See* MTD at 19 n.7 ("In Count IX, Plaintiff alleges the same claim against the same defendant for the same entry. In Count VIII, however, the factual basis for the claim is the unlawful search and entry, whereas in Count IX the factual basis for the claim is the filming and photographing. The violation, if any,

IV assert Fourth Amendment claims against the County (the "*Monell* Claims"). *See id.* ¶¶ 109–15, 123–38. *Second*, Counts VIII, XII, and XIII claim that the Individual Defendants violated Quintero's constitutional rights. *See id.* ¶¶ 158–63, 178–91. *Third*, Counts XVII and XVIII allege that the County violated Florida's Constitution by allowing its officials to search Quintero's property and to retaliate against him for exercising his First Amendment rights (the "State-law Claims"). *See id.* ¶¶ 211–23.

The Defendants advance several grounds for dismissal. *First*, they argue that Quintero has failed to state a claim for municipal liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). *See* MTD at 7–18. *Second*, they claim that each Individual Defendant is entitled to qualified immunity. *See id.* at 18–34. *Third*, they contend that Quintero doesn't "state a plausible claim for relief" as to either of his State-law Claims. *Id.* at 26 (capitalization altered).[3] We'll address each argument in turn.

### I.       *Monell* Liability

---

occurs from the allegedly unlawful search and entry itself. . . . This reasoning also applies to the municipal liability claims for unlawful search under the Fourth Amendment—Count II is based on an alleged policy of unlawful filming, while Count I is based on purported unlawful searches by drones."). Quintero doesn't respond to these arguments, *see generally* Response, so we'll consider them unopposed and grant the Defendants' motion to dismiss Counts II and IX by default.

The Defendants also urge us to dismiss Count XIX (Declaratory Relief, Miami-Dade County) for lack of jurisdiction because Quintero failed to allege "any future injuries whatsoever." MTD at 35; *see also id.* at 36 ("All of these allegations are of purported past harms that already occurred. None contemplate any future harm, much less imminent harm, as required to obtain prospective relief. Plaintiff does not allege that he is faced with any immediate threat of injury, nor does he claim that any of his purported injuries will likely occur in substantially the same manner."). Quintero completely ignores this argument, *see generally* Response, so we'll consider it unopposed and dismiss Count XIX for a lack of jurisdiction.

[3] The Defendants characterize the Complaint as a "shotgun pleading" because "the Complaint impermissibly incorporates the same 108 paragraphs of factual allegations into each of the 20 counts[.]" MTD at 29. But a complaint isn't a shotgun pleading merely because each count incorporates all the *facts*. Incorporation only becomes a problem when each count adopts the allegations of every preceding *count. See Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021) ("[The plaintiff's] second amended complaint does not fall into the first category [of shotgun pleadings] because although nine of the 19 counts incorporate almost every factual allegation in the complaint, none of them adopts the allegations in the preceding counts.").

Quintero asserts three claims against the County, alleging that it violated his Fourth Amendment rights by conducting "drone surveillance" of his property and allowing code enforcement officials to carry out "warrantless search[es]." Complaint ¶¶ 111, 69. The Defendants argue that these counts should be dismissed because Quintero hasn't identified *either* a "statement, ordinance, regulation, or decision that may constitute an official policy adopted by the County" that's relevant to his claims *or* any "widespread custom or practice that could serve as grounds for imposing liability against the County." MTD at 8–9. Instead, the Defendants say, Quintero "summarily alleges a series of purported 'customs' devoid of any factual support that extends beyond his own experiences." MTD at 9. We agree.

A municipality isn't vicariously liable under § 1983 when its employees violate a person's constitutional rights. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("But, under § 1983, local governments are only responsible for their own illegal acts. They are not vicariously liable under § 1983 for their employees' actions." (cleaned up)). Instead, "a municipality may be held liable for the actions of [its employees] only when municipal 'official policy' causes a constitutional violation." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *Monell*, 436 U.S. at 694–95). Thus, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). A plaintiff can establish a custom or policy in three ways: "(1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022).

6

For each of his *Monell* Claims, Quintero alleges that the County "had a custom, a policy, or a practice" of allowing unconstitutional conduct, *see* Complaint ¶¶ 113, 120, 127, 135, and insists that these "custom[s], polic[ies], or practice[s] [were] the moving force behind [his] injuries," *id.* ¶¶ 115, 122, 130, 138. Quintero purports to have identified two unconstitutional County policies: (1) a policy of allowing RER officials to "use drones to conduct searches" and "photograph residential property," (the "Drone Surveillance Policy"), *id.* ¶¶ 113, 120; and (2) a policy of allowing code enforcement officers to "conduct searches" and "photograph residential property without consent or a warrant," (the "Warrantless Search Policy"), *id.* ¶¶ 127, 135. After careful review, we conclude that Quintero doesn't sufficiently allege the existence of either policy.

### A.   The Drone Surveillance Policy

*First*, with respect to the Drone Surveillance Policy, Quintero alleges only that he: (1) "believed that the County had used drone surveillance" to inspect his property and (2) "reviewed several other RER cases online and noticed that the County had a widespread practice of using drone surveillance on private property." Complaint ¶¶ 27, 29 n.3. But Quintero merely *believes* that RER has employed drones to surveil his (and others') property. He doesn't allege that he personally observed any such surveillance (or that anyone else has)—nor has he spoken with any county officials about his speculative theory that "the County ha[s] a widespread practice of using drone surveillance on private property." Complaint ¶ 29 n.3. As best we can tell, Quintero has seen aerial photographs of his (and others') property on County websites and assumes (without evidence) that these photographs were taken by RER drones. *See* Response at 20 ("The County even posted photographs on its website showing the use of aerial drone surveillance. Mr. Quintero reviewed several RER cases online and saw that the County had a widespread practice of using drone surveillance on private property.").[4] But

---

[4] Quintero never alleges that the Drone Surveillance Policy is an "official" County policy. *See generally* Complaint; *see also* Response at 18–20 (relying exclusively on circumstantial evidence of an unofficial custom).

speculative assertions aren't entitled to the assumption of truth and aren't sufficient to survive a motion to dismiss. *See Harris v. Orange S.A.*, 636 F. App'x 476, 484 (11th Cir. 2015) ("[C]onclusory allegations and conjecture are insufficient to survive a motion to dismiss." (citing *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1064 (11th Cir. 2007))); *see also Hall v. Smith*, 170 F. App'x 105, 108 (11th Cir. 2006) (affirming the dismissal of a municipal-liability claim where the plaintiff "alleged no factual support for his conclusory statement that the City had a policy or custom of grossly inadequate supervision and training of its employees").[5]

Perhaps recognizing that his Drone Surveillance Policy claim is too speculative, Quintero tells us that he can "amend his Complaint to list a sufficient number of cases to show wide-spread practice of drone surveillance." Response at 20 n.8. So, we **GRANT** the MTD as to Count I, but we'll allow Quintero leave to amend.[6]

* * * *

A note on repleading Count I. We suspect that Quintero intends to bolster his allegations by identifying additional aerial photographs he's viewed online and which he believes were taken by RER drones. Two problems with this. *One*, simply "listing" more examples of aerial photography wouldn't cure Quintero's deficient *Monell* allegation. The number of aerial photographs is beside the point. The relevant question is whether Quintero can plausibly allege that those photographs were taken pursuant to an unconstitutional drone-surveillance program. Unless he can do that, additional aerial photographs won't move the needle.

---

[5] Even if we hadn't dismissed Count II as duplicative of Count I (and by default), we'd dismiss it for these same reasons.

[6] In their Reply brief, the Defendants argue that, "under the Fourth Amendment, the conduct Plaintiff has alleged—photographing private property that is readily viewable from the sky—is perfectly lawful." Reply at 5 (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986)). But as the Eleventh Circuit has repeatedly explained, "arguments raised for the first time in a reply brief are not properly before a reviewing court." *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (cleaned up).

*Two*, the Defendants have attached to their Reply a brief from a state-court dispute between the County and Quintero. *See* State-court Answer Brief [ECF No. 63–1]. In that brief, the County represented that a county official "testified that [RER] does not use drone surveillance and, for aerial imagery, only uses the aerial photographs on the publicly available Property Appraiser website." State-court Answer Brief at 12. Although we haven't considered the underlying testimony at this stage of the litigation—and take no position on its veracity—we warn Quintero (and his counsel) that filing a claim with no "reasonable factual basis" is sanctionable under Rule 11. *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 637 n.12 (11th Cir. 2010); *see also* Reply at 4 ("Nor will Plaintiff ever be able to plead such facts [showing the existence of the Drone Surveillance Policy] because the County does not have a code enforcement drone surveillance program. Of course, Plaintiff and his counsel both know this. As briefed by the County in Plaintiff's state-court code enforcement action—which was decided in favor of the County by the hearing officer, and then affirmed by the appellate division of the Circuit Court of the Eleventh Judicial Circuit of Florida—the aerial photographs on which RER relies are photographs taken from the Property Appraiser's publicly available website, not photographs taken by RER employees."). If Quintero knows that RER *doesn't* operate a drone surveillance program (as the Defendants allege), he should probably leave this claim out of any amended pleading.

### B.  The Warrantless Search Policy

*Second*, with respect to the Warrantless Search Policy, Quintero alleges that: (1) he was subjected to two warrantless property searches, *see* Complaint ¶¶ 63–64 ("On February 28, 2023 . . . Officer Carr searched Mr. Quintero's curtilage without a warrant and without Mr. Quintero's permission."); *see also id.* ¶ 69 ("On August 26, 2023, Code Enforcement Officer Nicole Lopez also disregarded the no trespassing signs on Mr. Quintero's property and conducted a warrantless search."); (2) "Officer Lopez openly justified her actions by claiming she was permitted to enter the curtilage of private property pursuant to the County's policy [and] stated that the County trained her to take

pictures on private property, even without a warrant or consent," *id.* ¶¶ 72–73; and (3) "[t]he County's policymakers have endorsed such actions, and even stated in a public hearing that code enforcement officers are authorized to enter and photograph private property without a warrant or permission from the owner," *id.* ¶ 74. On this claim too, Quintero has failed to plausibly allege a custom or policy.

As we've previously held, a plaintiff's allegation that *he's* been subjected to unconstitutional treatment on "several occasions" isn't enough to establish a policy; instead, a plaintiff must show that the policy is "persistent or wide-spread" by alleging that *others* have been subjected to the same treatment. *Ross v. Correction Health Servs.-Jackson Health Servs.*, 2023 WL 2475443, at *4 (S.D. Fla. Mar. 13, 2023) (Altman, J.); *see also ibid.* ("[I]t probably goes without saying a 'custom' that affects just one of the hundreds of inmates at Metro West just isn't 'persistent or wide-spread.'" (cleaned up)); *Gurrera v. Palm Beach Cnty. Sheriff's Off.*, 657 F. App'x 886, 893 (11th Cir. 2016) ("Plaintiff fails to identify any examples beyond his own arrest of widespread unconstitutional conduct. Accordingly, Plaintiff's § 1983 claims against the Sheriff's Office fail to state a claim under *Monell*." (cleaned up)); *Jennings v. Stewart*, 461 F. Supp. 3d 1198, 1201 (N.D. Fla. 2020) (Winsor, J.) ("Other than his own experience, Jennings offers only a broad and conclusory assertion that frequent and customary actions like those set forth herein demonstrate a de facto policy." (quotation marks omitted)). Quintero's exclusive reliance on his own experience thus isn't sufficient to demonstrate the existence of a widespread unconstitutional policy.

Resisting this conclusion, Quintero tells us that, because "[a] County policymaker [ ] endorsed [a warrantless search] during a public hearing . . . the County admitted to the [Warrantless Search Policy]." Response at 18. This argument suffers from two fatal flaws.

*One*, a public comment by a *single* policymaker doesn't establish an official policy, even if that individual is part of a body that constitutes a final policymaker for *Monell* purposes. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986) ("'[O]fficial policy' often refers to formal rules or

understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time. . . . If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."); *see also Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002) ("Because policymaking authority rests with the Commission as an entity, the County can be subject to liability only if the Commission itself acted with an unconstitutional motive. An unconstitutional motive on the part of one member of a three-member majority is insufficient to impute an unconstitutional motive to the Commission as a whole."); *Megladon, Inc. v. Vill. of Pinecrest*, 2025 WL 1517181, at *32 n.16 (S.D. Fla. May 28, 2025) (Altman, J.) ("To prevail on the 'official policy' theory of liability, a plaintiff must first 'identify an official policy,' such as a 'policy statement, ordinance, regulation, or decision *officially* adopted and promulgated *by that body's officers*[.]'" (cleaned up and emphasis added)).

*Two*, while a municipality may be liable when "final policymakers have acquiesced" to an unconstitutional practice, a plaintiff must show that the practice is "longstanding" and "constitutes the entity's standard operating procedure." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (cleaned up)). And, as we've discussed, Quintero's recitation of his own experiences isn't enough to establish a longstanding practice. So, even if we understood the unnamed policymaker's "endorsement" of the Warrantless Search Policy as "acquiescence," Quintero's claims would still fall short of establishing *Monell* liability because he hasn't shown that the Warrantless Search Policy is a "longstanding practice" to which policymakers have acquiesced. We therefore **GRANT** the MTD as to Counts III and IV because Quintero fails to assert a viable *Monell* claim.

## II.     Qualified Immunity

Quintero next alleges that the Individual Defendants—Code Enforcement Officers Nicole Lopez, Frankie Rodriguez, and Andres Borges—violated his constitutional rights. *First*, he says that

Officer Lopez "illegally entered and searched the curtilage of [his] home without a warrant, probable cause, or exigent circumstances." Complaint ¶ 160. *Second*, he claims that Officer Rodriguez "retaliated" against him for exercising his "First Amendment right to record government officials" by "issuing him bogus code enforcement warnings." *Id.* ¶¶ 180–81. *Third*, he alleges that Officer Borges also "retaliated" against him for recording public officials by "conspiring with other members within RER to issue Mr. Quintero bogus code enforcement citations." *Id.* ¶ 188. The Defendants insist that each Individual Defendant is entitled to qualified immunity.

"Qualified immunity protects government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In this way, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "To invoke the defense of qualified immunity, a government official must have been acting within the scope of his 'discretionary authority' when the allegedly wrongful acts occurred." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). If the government official makes such a showing, "the burden shifts to the plaintiff to show that the official's conduct (1) violated federal law (2) that was clearly established at the relevant time." *Ibid.* To qualify as clearly established, a legal principle "must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Bradley v. Benton*, 10 F.4th 1232, 1242 (11th Cir. 2021) (quotation marks omitted) (quoting *Waldron v. Spicher*, 954 F.3d 1297, 1305 (11th Cir. 2020)).

"Put another way, the defendant must have fair notice of his conduct's unconstitutionality, which derives from one of the following sources: (1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable." *Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008). In our District, only the "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law." *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007). In sum, "the doctrine of qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mitchell v. Peoples*, 10 F.4th 1226, 1229 (11th Cir. 2021) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

Quintero "does not dispute" that each Individual Defendant "was acting within the scope of his [or her] employment and discretionary authority," so we must only determine whether each Individual Defendant violated a clearly established legal principle. *See* Response at 8 n.4.

### A.  The Fourth Amendment Violation - Nicole Lopez

In Count VIII, Quintero alleges that Officer Lopez "illegally entered and searched the curtilage" of his home "without a warrant, probable cause, or exigent circumstances." Complaint ¶ 160. The Defendants argue that Officer Lopez's actions were lawful because "[o]fficers are permitted, without a warrant, consent, or exigent circumstances, 'to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just a[s] any private citizen may.'" MTD at 22 (quoting *United States v. Jackson*, 618 F. App'x 472, 476 (11th Cir. 2015)); *see also id.* at 20 (collecting cases about permissible "knock-and-talks"). Quintero agrees that "the Fourth Amendment does not strictly prohibit entry onto curtilage to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises" but contends that "the implied license to enter private property to knock on a person's door may be revoked by 'express orders from the person in

13

possession.'" Response at 14 (quoting *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006)). And he claims that "[a] homeowner can revoke an implied license to enter private property in several ways," including by erecting a fence or posting "No Trespassing" signs. *Id.* at 14–15.

"The private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself." *Taylor*, 458 F.3d at 1206. The scope of this area, known as the curtilage, is "determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987).[7] But the sanctity of the curtilage is not absolute: "The Fourth Amendment . . . is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." *Taylor*, 458 F.3d at 1204; *see also United States v. Rivers*, 134 F.4th 1292, 1303 (11th Cir. 2025) ("The knock-and-talk exception is premised on the implicit license that all individuals, including police officers, have to approach a home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." (cleaned up)). "The implied license afforded to officers to conduct a knock-and-talk, however, can be revoked, but only by *express orders* from the person in possession of the home." *Rivers*, 134 F.4th at 1303.

Here, Quintero alleges that the fence around his property and a "No Trespassing" sign "explicitly revoke[d] any perceived implied consent to enter his property." Response at 16. In support, Quintero cites several federal district court and Florida lower court opinions—all of which held that that various "knock-and-talks" were unconstitutional based on the presence of fences and/or "No

---

[7] There's no dispute that Officer Lopez entered the curtilage of Quintero's home. *See* Complaint ¶ 160 ("Officer Lopez illegally entered and searched the curtilage of Mr. Quintero's home[.]"); MTD at 21 ("The video shows Inspector Lopez entering the curtilage of Plaintiff's property through an unlocked open front driveway gate and walking down the driveway to the front door to knock."). And even if the Defendants had disputed Quintero's characterization of the area Officer Lopez entered, "[w]hat is curtilage is a question of fact" on which we'd defer to Quintero at the motion-to-dismiss stage. *United States v. Berrong*, 712 F.2d 1370, 1374 (11th Cir. 1983) (citations omitted).

Trespassing" signs. *See* Response at 14–15. Unfortunately for Quintero, none of these cases "clearly establish" that Quintero's fence and/or "No Trespassing" sign revoked Officer Lopez's implied license to conduct a knock-and-talk. *See Nugent*, 483 F.3d at 1237 (holding that only the Supreme Court, the Eleventh Circuit, and the highest court of the pertinent state can clearly establish law); *see also* Reply at 10 ("[Quintero] failed to meet his burden of showing that there was law clearly established by the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court giving Inspector Lopez fair warning that her conduct violated the Constitution. The only cases Plaintiff cites are from Florida district courts and state trial courts." (cleaned up)). And, far from establishing that a knock-and-talk on a fenced property is unconstitutional, the Eleventh Circuit has repeatedly held that officers *may* conduct knock-and-talks on gated or fenced properties. *See United States v. Calderon-Fuentes*, 788 F. App'x 630, 635 (11th Cir. 2019) (holding that a knock-and-talk was lawful even though the agents walked through an open gate); *Jackson*, 618 F. App'x at 478 (finding that the district court didn't err in concluding that officers conducted a permissible knock-and-talk despite the presence of a chain-link fence and a "beware-of-dog" sign).

That said, although Quintero failed to cite these cases, the Eleventh Circuit has twice *suggested*—both times in *dicta*—that a "No Trespassing" sign *might* affect the propriety of a knock-and-talk. *See Jackson*, 618 F. App'x at 477 ("However, the court concluded that no dog was present at the time and that the sign, which did not say 'No Trespassing' or 'Do Not Enter' did not serve as a signal that visitors were unwelcome."); *see also United States v. King*, 634 F. App'x 287, 291 (11th Cir. 2015) ("As the district court pointed out, there was no fence or no trespassing sign at the beginning of the driveway. Rather, the no trespassing sign was towards the back of the house tied to the structure of the house itself. Deputy May did not even see any trespassing sign."). But "[b]ecause dicta cannot establish law—period—it certainly cannot clearly establish law for purposes of defeating a qualified immunity defense." *Stalley v. Cumbie*, 124 F.4th 1273, 1298 (11th Cir. 2024) (Carnes, J., concurring)

(first citing *Santamorena v. Ga. Mil. Coll.*, 147 F.3d 1337, 1342 n.13 (11th Cir. 1998); then citing *Jones v. Cannon*, 174 F.3d 1271, 1288 n.11 (11th Cir. 1999); and then citing *Hamilton v. Cannon*, 80 F.3d 1525, 1531 (11th Cir. 1996)).

Without clearly established law prohibiting officers from conducting a knock-and-talk in the presence of a "No Trespassing" sign, Officer Lopez is entitled to qualified immunity. We therefore **GRANT** the MTD as to Officer Lopez.

### B.  The First Amendment Retaliation - Frankie Rodriguez & Andres Borges

In Count XII, Quintero alleges that Officer Rodriguez retaliated against him for exercising his First Amendment right "to record government officials" by "issuing him bogus code enforcement warnings." Complaint ¶¶ 180–81. In Count XIII, Quintero alleges that Officer Borges also retaliated against him for exercising his "First Amendment right to protest government action and record government officials" by "conspiring with other members within RER to issue" him "bogus code enforcement citations." *Id.* ¶¶ 187–88. The Defendants ask us to dismiss these counts because Quintero fails to sufficiently allege a "causal connection" between his protected activity and the Officers' actions. *See* MTD at 25–29. Specifically, the Defendants say Quintero failed to allege that Officers Rodriquez and Borges knew about Quintero's protected activity, such that they could've been motivated by a retaliatory animus. *See ibid.* Again, we agree with the Defendants.

A plaintiff alleging a First Amendment retaliation claim must plead three elements: "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Abella v. Simon*, 482 F. App'x 522, 523 (11th Cir. 2012).

Quintero has satisfied the first two elements. There can be no doubt that the right to peacefully protest government action is guarded by the First Amendment. *See Keating v. City of Miami*, 598 F.3d

16

753, 766 (11th Cir. 2010) (holding that individuals have "a clearly established right to assemble, protest, and demonstrate peacefully"); *see also Toole v. City of Atlanta*, 798 F. App'x 381, 387 (11th Cir. 2019) ("Toole was engaging in constitutionally protected activities—namely, protesting and filming police conduct—at the time of his unlawful arrest."). The First Amendment also protects "the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (citations omitted). And the Defendants don't dispute that code enforcement warnings and citations are the sorts of things that would deter a person of ordinary firmness from exercising his constitutional rights. *See generally* MTD (discussing only causation); *see also Eisenberg v. City of Miami Beach*, 1 F. Supp. 3d 1327, 1343 (S.D. Fla. 2014) (Altonaga, J.) (concluding that citations for code violations "would likely be sufficient to deter a person of ordinary firmness, especially as the adverse effect need not be substantial").

But Quintero falters at the third element: causation. A plaintiff must allege that the protected activity was the "motivating factor behind the defendants' [retaliatory conduct]." *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008). To do this, it goes without saying, a plaintiff must allege that the official who engaged in the retaliatory conduct knew about the plaintiff's protected activity. *See Huggins v. Sch. Dist. of Manatee Cnty.*, 151 F.4th 1268, 1282 (11th Cir. 2025) ("[R]etaliation requires that the plaintiff's past speech be the but-for cause of the specific defendant's conduct. So an official who does not even know about [the plaintiff's] viewpoint or past speech lacks the necessary connection to that speech to have restrained [the plaintiff's] speech and retaliated against him in violation of the First Amendment."). In *Huggins*, the Eleventh Circuit affirmed the district court's qualified-immunity dismissal of the plaintiff's First Amendment claims because the plaintiff "fail[ed] to allege that" the relevant officers "knew the content . . . of [the plaintiff's] speech." *Id.* at 1283–84. In so holding, the court described this failure as a "fatal shortcoming." *Id.* at 1283. Our case is the same.

17

As the Defendants correctly observe, the Complaint lacks *any* facts establishing that Officers Rodriguez and Borges "knew that Plaintiff had recorded government officials" or that he had protested the County's actions. MTD at 26; *see also* Reply at 6–7 ("If the Officers had no knowledge about Plaintiff's protests before they issued the citations, then necessarily they could not have been subjectively motivated to issue those citations."). Ignoring this argument, Quintero asks us to leave this question of causation "to the jury." Response at 12. But "factual allegations in a complaint must possess enough heft to set forth a plausible entitlement to relief," which means that a complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282–83 (11th Cir. 2007) (cleaned up). Quintero therefore cannot ask us to ignore his deficient pleading by hoping that a jury will fill in the blanks.

Quintero's allegations are especially deficient as to Officer Borges. Far from alleging that his protected activity was the "but-for" cause of Officer Borges's allegedly retaliatory actions, *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019), Quintero concedes that Officer Borges issued citations on direct orders from his superiors, *see* Complaint ¶ 59 ("Officer Borges . . . openly admitted that high-ranking RER officials directed him to issue the citation."). This forecloses any possible inference that Officer Borges, as an individual, acted with a retaliatory motive. What Quintero is really saying (we think) is that certain other RER officials retaliated against Quintero *through* Officer Borges. But we can't "impute [another official's] motive to people who carried out [those] instructions with no apparent knowledge of [the official's] allegedly unconstitutional reason for giving them." *Huggins*, 151 F.4th at 1284; *see also Iqbal*, 556 U.S. at 676 ("[V]icarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

18

Since Quintero hasn't plausibly alleged that Officers Rodriguez and Borges violated the Constitution, they're entitled to qualified immunity.

### III.    The State-law Claims

Finally, Counts XVII and XVIII allege violations of the Florida State Constitution, including the right to be free from unlawful searches and the right to exercise free speech, respectively. *See* Complaint ¶¶ 211–23. The Defendants advance three grounds for dismissing these claims—all meritorious.

*First*, the Defendants say that, "under Florida law, 'no cause of action exists for money damages for a violation of a state constitutional right.'" Response at 37 (quoting *Corbett v. Transp. Security Admin. et al.*, 968 F. Supp. 2d 1171, 1191 (S.D. Fla. 2012) (Lenard, J.), *aff'd*, 568 F. App'x 690 (11th Cir. 2014)). Quintero doesn't respond to this argument and claims only that he brought his state claims under Florida Statute 768.28, which waives Florida's sovereign immunity for certain torts, and that he provided the County with pre-suit notice. *See* Response at 13 n.5. As we've explained, we take Quintero's failure to respond as a concession. *See Jones*, 564 F. App'x at 434 ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed." (cleaned up)).

*Second*, the Defendants argue that, "because the [I]ndividual Defendants did not violate Plaintiff's constitutional rights, . . . the County is not vicariously liable[.]" (citing *Mallory v. O'Neil*, 69 So. 2d 313, 315 (Fla. 1954)). Quintero agrees that his state-law claims rise and fall with his claims against the Individual Defendants. *See* Response at 13 n.5 ("Count XVIII is a state law retaliation claim against the County based on the action of its employees, *i.e.* Frankie Rodriguez and Andres Borges. The standard to dismiss state law claims is the same as federal claims."); *see also id.* at 16 n.6 ("Count XVII is a state law unlawful search claim against the County based on the action of Officer Lopez. A state law claim for unlawful search is held to the same standard as federal claims."). And, since we've

already dismissed Quintero's claims against Officers Lopez, Rodriquez, and Borges, *see supra* §§ II.A–B, we grant this portion of the MTD as well.

*Third*, the Defendants urge us to "decline to exercise supplemental jurisdiction over [the] Plaintiff's state law claims" if we "dismiss[] the federal claims." Response at 37; *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—the district court has dismissed all claims over which it has original jurisdiction[.]"). Again, Quintero doesn't ask us to continue to exercise supplemental jurisdiction over *only* his state-law claims. *See generally* Response. He's thus forfeited this argument. *See Jones*, 564 F. App'x at 434 ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed." (cleaned up)).

In any event, "[w]hen all federal claims are dismissed before trial, a district court should typically dismiss the pendant state claims as well." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018); *see also* 28 U.S.C. § 1367(c)(3) (noting that a district court may decline to exercise supplemental jurisdiction over a state-law claim where "the district court has dismissed all claims over which it has original jurisdiction"). "Although the district court has discretion, concerns of federalism—namely, of federal courts of limited jurisdiction weighing in on state law—counsel in favor of dismissing state-law claims after the federal claims are dismissed." *Silas v. Sheriff of Broward Cnty., Fla.*, 55 F.4th 863, 866 (11th Cir. 2022). "The Supreme Court has also put a thumb on the scale: 'In the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise [pendent] jurisdiction[.]'" *Silas*, 55 F.4th at 866 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). "A district court, exercising its already broad discretion, will rarely err by declining supplemental jurisdiction after the federal claims that supported its jurisdiction are dismissed." *Ibid.*; *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a

20

jurisdictional sense, the state claims should be dismissed as well."). We'll follow the Supreme Court's admonition and decline to exercise our discretionary jurisdiction under 28 U.S.C. § 1367(c)(3) over the Quintero's remaining State-law Claims here.

We therefore **GRANT** the MTD as to Counts XVII and XVIII.

\* \* \* \*

Quintero's claims fall into three categories. *First*, there's Counts V, VI, VII, X, XIV, XV, XVI, XX, and XXI, which Quintero has asked us to dismiss without prejudice. We'll grant his request and dismiss these claims *without prejudice.*

*Second*, there's Counts II, IX, and XIX, which Quintero has abandoned by failing to respond to the Defendants' dismissal arguments. Because he's abandoned them, we'll dismiss Counts II and IX *with prejudice. See Chambers v. Cherokee Cnty.*, 743 F. App'x 960, 962 (11th Cir. 2018) ("The district court correctly determined that Chambers abandoned her equal protection, due process, and conspiracy arguments by failing to address Defendants' contentions against them before the district court."); *see also Gent Row, LLC v. Truist Fin. Corp.*, 2022 WL 3682172, at \*2 (S.D. Fla. June 27, 2022) (Dimitrouleas, J.) ("The Court agrees that Plaintiff has abandoned these claims by failing to defend them in opposition to the Motion to Dismiss. Accordingly, Counts II and III shall be dismissed with prejudice." (cleaned up)). But, as the Defendants aptly observe, Count XIX must be dismissed without prejudice because "[d]ismissals for a lack of jurisdiction are not judgments on the merits and are to be entered without prejudice." *Dupree v. Owens*, 92 F.4th 999, 1007 (11th Cir. 2024).

*Third*, we have Counts I, III, IV, VIII, XII, XIII, XVII, and XVIII, which we've dismissed after careful consideration. As to these claims only, however, we'll give Quintero one chance to amend. *See Arencibia v. AGA Serv. Co.*, 2022 WL 1499693, at \*5 (11th Cir. May 12, 2022) ("[D]istrict courts should freely give leave to amend when justice so requires, [but] they need not grant leave to amend when such amendment would be futile." (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## CONCLUSION

After careful review, therefore, we **ORDER** and **ADJUDGE** as follows:

1. Counts V, VI, VII, X, XIV, XV, XVI, XIX, XX, and XXI are **DISMISSED** *without prejudice* and without leave to amend.

2. Counts II and IX are **DISMISSED** *with prejudice*.

3. Counts I, III, IV, VIII, XII, XIII, XVII, and XVIII are **DISMISSED** *without prejudice* but with leave to amend.

4. Quintero must file any amended complaint addressing the deficiencies we've identified in this Order by **July 14, 2026**.

**DONE AND ORDERED** in the Southern District of Florida on June 30, 2026.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record